**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Larry SMITH, Defendant-Appellant.**

**No. 72-1728.**

United States Court of Appeals, Eighth Circuit.

Submitted March 16, 1973.

Decided April 12, 1973.

Rehearing Denied May 4, 1973.

Murry L. Randall, St. Louis, Mo., for appellant.

Robert B. Schneider, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before MATTHES, Chief Judge, ROSS and STEPHENSON, Circuit Judges.

PER CURIAM.

Larry Smith appeals from his conviction, after a trial to the court, of knowingly possessing an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871. We affirm the judgment of conviction.

The firearm in question is an unserviceable Thompson submachine gun. There is no challenge to the proof of possession by Smith, but rather, he bases his appeal from his conviction on two points: First, that the welded receiver of the gun was not a firearm within the meaning of the National Firearms Act, and therefore was not required to be registered, and secondly, that the Government did not prove that Smith had knowledge that the inoperative gun had to be registered.

26 U.S.C. § 5861(d) provides in pertinent part that it is unlawful "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record;" 26 U.S.C. § 5845(a) states that "firearm" as used in the Act includes machinegun; and 26 U.S.C. § 5845(b) defines machinegun as follows: "The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." The key question in the first issue raised by the appellant then becomes whether or not the machinegun in question could be "readily restored to shoot, automatically . . . ." Since the trial court did not make a specific finding in this regard, we remanded with the request that a finding be made as to whether or not the machinegun could be readily restored to shoot automatically as provided in 26 U.S.C. § 5845(b).

The trial court then made the requested finding as follows:

"The sole evidence on the issue as to which our findings are directed is that given by Robert J. Scroggie, a firearms enforcement officer with the Alcohol, Tobacco, Firearms Division of the United States Treasury Department. He testified, and we find, that the gun was registered [to a former owner] as an unserviceable Thompson submachine gun, the registration form stating that the barrel was filled with metal. This statement indicated to Scroggie that the barrel was welded so that the weapon was not in fireable condition.

"There were two welds in the gun which obviously was, when manufactured, 'designed to shoot.' The barrel of the gun was welded closed at the breech and was also welded to the receiver on the outside under the handguard. Scroggie testified that there are two possible ways by which the firearm could be made to function as such. The most feasible method would be to cut the barrel off, drill a hole in the forward end of the receiver and then rethread the hole so that the same or another barrel could be inserted. To do so would take about an 8-hour working day in a properly equipped machine shop. Another method which would be more difficult because of the possibility of bending or breaking the barrel would be to drill the weld out of the breech of the barrel.

"The term 'readily restorable to shoot', as used in Section 5845(b) is not defined, so that whether a firearm is capable of being 'readily restorable to shoot' is a matter of judgment. In view of the object of the statute and the context of the legislation as a whole, we find as a fact that the gun in question is capable of being 'readily' restored to shoot automatically. even though the process of restoration would require a working day for that purpose."

██ We have examined the record, including the transcript of the testimony of agent Scroggie, and conclude that the proof relating to the restoration of the machinegun is exactly as described by the trial court and that this constituted "substantial evidence, taking the view

most favorable to the Government, to support the fact determination by the trial court. . . . " *See* United States v. Rischard, 471 F.2d 105, 107 (8th Cir. 1973). We conclude, therefore, that the trial court correctly determined that the machinegun in this case could be readily restored to shoot automatically and that it was required to be registered.

■ Smith's second allegation relating to the necessity of alleging and proving knowledge that Smith knew the gun had to be registered is likewise without merit. The Supreme Court has specifically held that the Act

"requires no specific intent or knowledge that hand grenades were unregistered. It makes it unlawful for any person 'to receive or possess a firearm which is not registered to him.' By the lower court decisions at the time that requirement was written into the Act the only knowledge required to be proved was knowledge that the instrument possessed was a firearm. See Sipes v. United States, [8th Cir.] 321 F.2d 174, 179, and cases cited." United States v. Freed, 401 U.S. 601, 607, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971).

■ Smith surely could not have felt that the machinegun in question was not a "firearm" in view of the fact that he had concealed the weapon under a shed back of his trailer and asked the sum of $300.00 for it. He finally sold it for $175.00. Under these circumstances, he can hardly claim that he thought it to be completely useless as a weapon and contrary to allegations of Smith's counsel, the rationale of United States v. Freed, *supra,* is controlling. In that case, the Supreme Court noted:

"They [hand grenades] are highly dangerous offensive weapons, no less dangerous than the narcotics involved in United States v. Balint, 258 U.S. 250, 254, [42 S.Ct. 301, 66 L.Ed. 604] where a defendant was convicted of sale of narcotics against his claim that he did not know the drugs were covered by a federal act. We say with Chief Justice Taft in that case:

'It is very evident from a reading of it that the emphasis of the section is in securing a close supervision of the business of dealing in these dangerous drugs by the taxing officers of the Government and that it merely uses a criminal penalty to secure recorded evidence of the disposition of such drugs as a means *of taxing and restraining the traffic.* Its manifest purpose is to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute, and if he sells the inhibited drug in ignorance of its character, to penalize him. Congress weighed the possible injustice of subjecting an innocent seller to a penalty against the evil of exposing innocent purchasers to danger from the drug, and concluded that the latter was the result preferably to be avoided. *Id.,* at 253–254, [42 S.Ct., at 302–303]." *Id.* at 609–610, 91 S.Ct. at 1118.

*Cf.* United States v. Wiley, 72–1516 (8th Circuit, April 20, 1973); Bryant v. United States, 462 F.2d 433, 435 (8th Cir. 1972); United States v. Crow, 439 F.2d 1193, 1195 (9th Cir. 1971), vacated on other grounds, 404 U.S. 1009, 92 S. Ct. 687, 30 L.Ed.2d 657 (1972).

For the reasons hereinbefore set forth we affirm the judgment of conviction.