**UNITED STATES of America**
**v.**
**Matthew J. CATANZARO.**
**Crim. No. H–416.**

United States District Court,
D. Connecticut.

Dec. 28, 1973.

Stewart H. Jones, U. S. Atty., Albert Dabrowski, Asst. U. S. Atty., Hartford, Conn., for plaintiff.

William P. Murray, F. Owen Eagan, West Hartford, Conn., for defendant.

## RULING ON MOTION TO DISMISS INDICTMENT

BLUMENFELD, Chief Judge.

The defendant, Matthew J. Catanzaro, was indicted by the grand jury on January 16, 1973, for knowingly possessing "a certain firearm, to wit: a sawed-off shotgun, with a barrel length of approximately 15¼ inches," which firearm had not been registered to him in the National Firearms Registration and Transfer Record, and for knowingly possessing a firearm which was not identified by a serial number as required by law, in violation of provisions of the National Firearms Act, 26 U.S.C. §§ 5861(d), (i) and 5871.[1] He now moves to dismiss the indictment on the grounds that the item which is the subject matter of the indictment is not a "firearm" within the terms of the statute, 26 U.S.C. § 5845(a), (d) and (e);[2] that provisions of 26 U.S.C. § 5845(a), (d) and (e) are unconstitutionally vague; that federal law enforcement agents have improperly

---

[1]. The National Firearms Act, 26 U.S.C. §§ 5861(d), (i) and 5871 provides:

5861. Prohibited Acts.

It shall be unlawful for any person—

 \* \* \* \* \*

(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or

 \* \* \* \* \*

(i) to receive or possess a firearm which is not identified by a serial number as required by this chapter.

5871. Penalties.

Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both, and shall become eligible for parole as the Board of Parole shall determine.

[2]. The National Firearms Act, 26 U.S.C. § 5845(a), (d) and (e) provides:

5845. Definitions.

For the purpose of this chapter—

(a) Firearm.—The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) *any other weapon, as defined in subsection (e)*; (6) a machinegun; (7) a muffler or a silencer for any firearm whether or not such firearm is included within this definition; and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secre-

sought to "manufacture jurisdiction" in this case; that the Grand Jury may not have considered the alleged improper acts of federal agents in rendering the indictment; and that the prosecution of this indictment "violates fundamental fairness and is repugnant to the American system of criminal justice."

## I. FACTS

The central issue in these proceedings is whether on August 12, 1972, the item which is the subject matter of the indictment was a "firearm" within the terms of 26 U.S.C. § 5845(a), (e); that is, whether it was a weapon which, though inoperable at the time, was nevertheless "readily restorable to fire." [3] At the hearing on the motion, the following facts appeared. Having come into possession of the item at issue in August, 1972,[4] George Politis, a special agent with the Alcohol, Tobacco and Firearms Division ("ATF") of the United States Treasury Department, observed that several parts on the item were broken or missing. In order to obtain replacements, he contacted the na-tional office of ATF in Washington, D. C., and subsequently sent the item to that office. Robert J. Scroggie, a firearms enforcement officer with ATF, received the item in Washington on August 28, 1972. He determined, and he so specified in an affidavit, that the item was originally manufactured as an American Eagle (Noble) model 66 12-gauge shotgun. He consulted a standard reference work in the field (termed a "firearms encyclopedia" at the hearing) and identified the missing parts. He then contacted Special Agent Politis and asked him to obtain the parts. Politis found that Noble, the manufacturer, had gone out of business, but upon further inquiry he learned that Noble's tools and inventory had been purchased by Smith & Wesson, another firearms manufacturer. Journeying to the Smith & Wesson plant in Springfield, Massachusetts, Politis obtained the missing parts from Noble stock on hand for less than $15.-00. He subsequently sent the parts to Scroggie, who completed assembly of the shotgun and test-fired it. Replacement of the missing and broken parts and

---

tary or his delegate finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

    \*    \*    \*    \*    \*

    (d) Shotgun.—The term "shotgun" means ·a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ballshot) or a single projectile for each pull of the trigger, and shall include any such weapon *which may be readily restored to fire* a fixed shotgun shell.

    (e) Any other weapon.—The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which *may be readily restored to fire*. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition. (Emphasis added.)

3. At the hearing the defendant introduced testimony by Harvey Friend, a consulting engineer with long experience in the manufacture of firearms, to the effect that the item at issue was not "restored" in the sense of being returned to its original state at the time of manufacture. The plain words of the statute, however, indicate that the operative phrase refers to weapons or devices presently incapable of firing projectiles, but which may with relative ease be made *capable of firing*, regardless of whether they may be reconstructed into the identical condition from which they emerged from the factory.

4. The means by which Special Agent Politis came into possession of the item are not in issue in these proceedings.

reassembly of the shotgun took approximately one hour.

## II. ISSUES RAISED BY THE MOTION TO DISMISS

■ It is uncontroverted that replacements for the parts which were broken or missing from the object sent by Politis to Scroggie were available at the Smith & Wesson plant in Springfield, Massachusetts. In United States v. Melancon, 462 F.2d 82 (5th Cir.), cert. denied, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972), the court held that a Japanese Knee Mortar was a "firearm" within the terms of 26 U.S.C. § 5861(d) even though there was no evidence that projectiles used in the mortar had been manufactured, or had even been in existence, since the defeat of the Japanese in 1945. Nor is it controverted that upon receiving the replacement parts, Scroggie was able to reassemble the shotgun and put it in working condition in approximately one hour. In United States v. Smith, 477 F.2d 399 (8th Cir. 1973) (per curiam), the court held that a submachinegun on which the barrel was welded closed at the breech and was also welded to the receiver on the outside under the handguard was "readily restorable to shoot" within the terms of 26 U.S.C. § 5845(b) despite the fact that the process of restoration would require eight hours' work in a properly equipped machine shop. *Cf.* United States v. Barno, 340 F.Supp. 1326 (D.D.C.1972); United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns, 443 F.2d 463 (2d Cir.), cert. denied, 404 U.S. 983, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). The item at issue here was certainly more "readily restorable to fire" than the objects held to be firearms in *Melancon* and *Smith*.

The only question which might remain is whether the fact that replacement parts were available at the Smith & Wesson plant was so sufficiently known that the Noble 66 shotgun should be considered "readily" restorable. The defendant introduced testimony by Mr. Friend that he was unable to obtain replacements for the missing and broken parts from several gunsmiths. It is not disputed, however, that Firearms Enforcement Officer Scroggie was able to identify the parts by consulting a standard firearms reference work and that Special Agent Politis, armed with this knowledge, was able to determine that Noble parts and inventory were now owned by Smith & Wesson by inquiries directed to knowledgeable people in the firearms field. Robert Davidson, Superintendent of the Long Gun Division of Smith & Wesson, former president of Noble, testified that Smith & Wesson salesmen generally informed gundealers that Noble parts could now be provided by Smith & Wesson. Under these circumstances, I find that the item which is the subject matter of the indictment herein was a "firearm" within the terms of the National Firearms Act.

■■ The defendant also claims that the "definitions" provisions of the Act, 26 U.S.C. § 5845(a), (d) and (e), are unconstitutionally vague in that the phrase "which may be readily restored to fire" is not sufficiently definite to provide adequate warning as to the kinds of weapons included within the strictures of the Act. The Court of Appeals for this circuit upheld a similar statutory provision in United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns, *supra*.[5] However, that case was a civil forfeiture proceeding. Although Judge Lumbard invoked the standard used in a

5. "The only question is whether 18 U.S.C. § 921(a) which defines a firearm as 'any weapon (including a starter gun) which * * * may readily be converted to expel a projectile by the action of an explosive' is unconstitutionally vague because of the words 'may readily be converted.'" 443 F.2d at 464.

criminal case, United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947),[6] the statute challenged in *Petrillo* was a "regulatory statute governing business activity" and thus may be subject to a somewhat less stringent standard of review.[7] The standard for criminal statutes such as that challenged in the instant case was described in Papachristou v. City of Jacksonville, *supra*, 405 U.S. at 162, 92 S.Ct. at 843: a statute is void for vagueness if it " 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.' " In view of the prior judicial decisions applying the definitional terms, and the relative ease with which Special Agent Politis was able to obtain replacement parts for the Noble 66 shotgun and Firearms Enforcement Officer Scroggie was able to restore the weapon to a condition capable of firing, I find that the phrase "which may be readily restored to fire" is not unconstitutionally vague *in se*, and that it did not fail to provide fair warning to a person of ordinary intelligence that the item which is the subject matter of this indictment was a "firearm" within the terms of the National Firearms Act.

The remaining grounds urged by the defendant are without merit.

Accordingly, the motion to dismiss the indictment is denied.

So ordered.

6. "The test to be applied is whether the language conveys 'sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.' United States v. Petrillo, 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877. . . ."
443 F.2d at 465–466.

7. "Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.' Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888.
   *Lanzetta* is one of a well-recognized group of cases insisting that the law give fair notice of the offending conduct. See

Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322; Cline v. Frink Dairy Co., 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146; United States v. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516. In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed. Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367; United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561; United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877."
Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed. 2d 110 (1972).