*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0103p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 04-5082

ONE TRW, MODEL M14, 7.62 CALIBER RIFLE,
SERIAL NUMBER 1488973 FROM WILLIAM K.
ALVERSON,

*Defendant,*

WILLIAM K. ALVERSON,

*Claimant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 02-00455—Karl S. Forester, District Judge.

Argued: October 5, 2005

Decided and Filed: March 20, 2006

Before: MOORE, GIBBONS, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Richard E. Gardiner, Fairfax, Virginia, for Appellant. David Y. Olinger, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee. **ON BRIEF:** Richard E. Gardiner, Fairfax, Virginia, for Appellant. David Y. Olinger, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

MOORE, J., delivered the opinion of the court, in which GIBBONS, J., joined. GRIFFIN, J. (pp. 9-13), delivered a separate dissenting opinion.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. This case involves a forfeiture of the Defendant weapon pursuant to 26 U.S.C. § 5872(a) because the weapon was found to be a machinegun within the terms of the National Firearms Act ("NFA"), 26 U.S.C. § 5845(b), and was not registered to the Claimant-Appellant, William K. Alverson ("Alverson"), in violation of 26 U.S.C. § 5861(d). Alverson claims that the Government failed to satisfy the burden required to justify the forfeiture

because it did not show that the Defendant firearm was "designed to shoot" automatically or could "be readily restored to shoot" automatically under the NFA's definition of a machinegun. 26 U.S.C. § 5845(b). For the reasons set forth below, we **AFFIRM** the district court's judgment granting the United States's motion for summary judgment.

## I. BACKGROUND

In the fall of 2001, the Bureau of Alcohol, Tobacco, and Firearms ("ATF") Field Office in Lexington, Kentucky was informed that MK Specialties ("MKS") was selling firearms made from cut-up M-14 receivers marketed as the MKS M-14. The Lexington ATF Office determined that Alverson had purchased one of these weapons. In early January 2002, ATF Special Agents verified that Alverson was in possession of such a weapon, and on January 11, 2002, ATF Special Agents seized it from him. Subsequent to its seizure, ATF Firearms Enforcement Officer Richard Vasquez examined the weapon and issued a report, concluding that the Defendant weapon was a machinegun within the meaning of the NFA. ATF also conducted a search of the National Firearms Registration and Transfer Record and found that the Defendant weapon was not registered to Alverson or any other person.

Following the seizure, Alverson filed a claim of ownership of the Defendant weapon, contesting the forfeiture on the ground that it was not a machinegun under the NFA. On October 3, 2002, the United States filed a complaint for forfeiture in rem, claiming that the Defendant weapon was a "machinegun" under 26 U.S.C. § 5845(b) and was not registered to Alverson, in violation of 26 U.S.C. § 5861(d). The United States moved for summary judgment, and Alverson filed a motion to stay. The district court dismissed Alverson's motion to stay and granted the Government's motion for summary judgment. Alverson then timely filed an appeal of the district court's grant of summary judgment.

## II. ANALYSIS

### A. Standard of Review

We review a grant of summary judgment de novo. *United States v. Any & All Radio Station Transmission Equip.*, 218 F.3d 543, 547 (6th Cir. 2000) (citing *EEOC v. Nw. Airlines, Inc.*, 188 F.3d 695, 701 (6th Cir. 1999)). Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### B. Burden of Proof

In 2001, Congress enacted the Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C. § 983, which, among other reforms, placed on the Government the burden of proving by a preponderance of the evidence that the property is subject to forfeiture in most civil forfeiture proceedings. *Id.* § 983(c)(1). CAFRA states that "a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property" shall be governed by CAFRA's burden of proof requirements. 18 U.S.C. § 983(c)(1). However, CAFRA later limits the application of this provision by stating that "'civil forfeiture statute' . . . (2) does not include— . . . (B) the Internal Revenue Code of 1986." *Id.* § 983(i); *see also United States v. Deep Sea Fisheries, Inc.*, 410 F.3d 1131, 1134 (9th Cir. 2005) (explaining that CAFRA applies to "all civil forfeitures under federal law unless the particular forfeiture statute is specifically exempted in 18 U.S.C. § 983(i)(2)"). The NFA provision under which this forfeiture was initiated, 26 U.S.C. § 5872(a), is contained in Title 26, which is the

Internal Revenue Code of 1986.[1] Therefore, CAFRA does not govern the burden of proof here. *See United States v. One Harrington & Richardson Rifle, Model M-14, 7.62 Caliber Serial No. 85279*, 378 F.3d 533 (6th Cir. 2004) (order) (applying the pre-CAFRA burden-of-proof standard to a forfeiture pursuant to the NFA).

We now turn to the law governing the burden of proof necessary to sustain this forfeiture pursuant to the NFA. The Treasury Fund Forfeiture Act of 1992 provided that

> [e]xcept as provided in paragraph (2) and section 5872(b) of the Internal Revenue Code of 1986, the provisions of law relating to — (A) the seizure, summary and judicial forfeiture, and condemnation of property for violation of Customs laws, (B) the remission or mitigation of such forfeiture, and (C) the compromise of claims, shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under any applicable law enforced or administered by the Bureau of Alcohol, Tobacco and Firearms.

Pub. L. 102-393, Tit. VI, § 638(b)(1), 106 Stat. 1779 (formerly codified at 31 U.S.C. § 9703(o)(1)), *repealed by* Homeland Security Act of 2002, Pub. L. 107-296, Tit. XI, Subtit. B, § 1113, 116 Stat. 2279 (codified at 18 U.S.C. § 3051).[2] The Customs laws governing forfeitures are found at 19 U.S.C. §§ 1602-1631. Under these provisions, where a person whose property has been seized for forfeiture wants to contest the seizure, that person must first file a claim of ownership of property. 19 U.S.C. § 1608. The Government must then initiate a civil judicial forfeiture action. *Id.* § 1604. Under the burden-shifting scheme set forth by 19 U.S.C. § 1615, the Government bears the burden of establishing probable cause to believe that the property was used in violation of the law, and the burden then shifts to the claimant to prove by a preponderance of the evidence that the item was improperly seized. *Id.* § 1615; *Any & All Radio Station Transmission Equip.*, 218 F.3d at 548.

## C. Statutory Interpretation

The NFA defines a machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The statute does not define "designed to shoot" or "can be readily restored," and neither the Supreme Court nor the Sixth Circuit has defined these terms.

### 1. The ATF Rulings

The Government argues that we should rely on several ATF Rulings ("the Rulings") that define "designed to shoot" and "can be readily restored" and that classify various modified weapons

---

[1] The United States Code explains that the Internal Revenue Code of 1954 as amended may be cited as the Internal Revenue Code of 1986, and that "[t]he sections of Title 26, United States Code, are identical to the sections of the Internal Revenue Code." 1 U.S.C. § 204; Tax Reform Act of 1986, Pub. L. 99-514, § 2(a), 100 Stat. 2095 (noting that "[t]he Internal Revenue Title enacted August 16, 1954, as heretofore, hereby, or hereafter amended, may be cited as the 'Internal Revenue Code of 1986'").

[2] The district court erroneously applied 18 U.S.C. § 3051(c)(1), which repealed 31 U.S.C. 9703(o) but was not enacted until November 25, 2002, over ten months after the property at issue was seized. This error, however, is immaterial, because the Customs laws, 19 U.S.C. §§ 1602-1631, apply under either statute, and thus the burden of proof is the same.

Alverson's argument that former 31 U.S.C. § 9703(o)(1) does not apply to forfeitures pursuant to 26 U.S.C. § 5872(a) because § 5872(a) is not an "applicable law enforced or administered by the Bureau of Alcohol, Tobacco and Firearms" is without merit. Because Congress specifically exempted § 5872(b) but not § 5872(a) from § 9703(o)(1)'s reach, the intent was clearly for § 5872(a) to be considered an "applicable law" under § 9703(o)(1). Moreover, Alverson points to no alternative statute that would have governed in place of 31 U.S.C. § 9703(o)(1).

as machineguns because they were "designed to shoot" automatically.  Typically, where a statute is ambiguous and the implementing agency has interpreted the statute, a court will determine what, if any, level of deference the interpretation should be afforded and then defer accordingly.  The Supreme Court has distinguished between the more deferential standard of *Chevron*, under which agency interpretations will control as long as they are "based on a permissible construction of the statute," *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984), and the less deferential standard of *Skidmore*, under which the weight of an agency's interpretation "depend[s] upon . . . all those factors which give it power to persuade, if lacking power to control," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  *See United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001).  *Chevron* deference will be afforded to agency interpretations, like the ATF Rulings, that were not made pursuant to notice-and-comment rulemaking or formal adjudication, only where the reviewing court determines that Congress intended such agency action to have the "force of law." *Mead Corp.*, 533 U.S. at 231-32; *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

The amount of deference that the Rulings merit is unsettled,[3] and we need not decide this question in this case.  The ATF Rulings, even if entitled to full *Chevron* deference, would provide little guidance, as their explanation of "can be readily restored to shoot" hardly helps to clarify the statutory definition of this provision.[4]  Moreover, the Rulings have little bearing on whether the Defendant weapon "can be readily restored to shoot[] automatically" because the weapons at issue in the Rulings were classified as machineguns based on the ATF's determination that they were "designed to shoot" automatically.[5]

### 2. Available Evidence

In support of its motion, the Government submitted a Firearms Technology Branch Report of Technical Examination ("FTB Report") written by ATF Officer Richard Vasquez after his investigation of the Defendant weapon that detailed its characteristics and the methods used to restore it to automatic shooting capacity.[6]  The Claimant objects to the admissibility of the FTB

---

[3]This matter is further complicated by the fact that the we are interpreting a criminal statute, and under the rule of lenity, ambiguities are generally resolved in favor of the party accused of violating the law, even in a civil proceeding. *See Leocal v. Ashcroft*, 125 S. Ct. 377, 384 n.8 (2004); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517-18 (1992) (plurality); *Crandon v. United States*, 494 U.S. 152, 168 (1990); *id.* at 177 (Scalia, J., joined by O'Connor & Kennedy, JJ., concurring).  *But see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703, 704 n.18 (1995).  However, even ambiguous criminal statutes may not trigger the rule of lenity unless the ambiguity is "'grievous.'" *See Muscarello v. United States*, 524 U.S. 125, 139 (1998) (quoting *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994)).

[4]The Rulings define the "can be readily restored" prong to mean "weapons which previously could shoot automatically but will not in their present condition," and the "designed" prong to include "weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts." ATF Rul. 82-2, 1982-1 A.T.F. Q.B. 18; *accord* ATF Rul. 82-8, 1982-2 A.T.F. Q.B. 49; ATF Rul. 83-5, 1983-3 A.T.F. Q.B. 35.

[5]The Rulings found the particular weapons there at issue to be "designed to shoot" automatically where a "simple modification" such as "cutting, filing, or grinding," ATF Rul. 82-2, 1982-1 A.T.F. Q.B. 18, or "bending, breaking or cutting," ATF Rul. 83-5, 1983-3 A.T.F. Q.B. 35, allowed the weapon to shoot automatically.

[6]The FTB Report stated that the Defendant weapon had been manufactured from an M-14 machinegun receiver, which has been classified as a machinegun by the ATF since 1968, Rev. Rul. 58-417, 1958-2 C.B. 875, that had been cut in half.  The Report notes that the Defendant weapon had been modified — severed in one location, and then welded back together with some of the metal being removed — and was in this semiautomatic condition when it was seized, but retained several design features that are specific to an M-14 machinegun.  The Report further estimates that the Defendant weapon could be altered to shoot automatically in approximately forty-five minutes using a hand grinder, a

Report, as it was unsworn and not accompanied by an affidavit. *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970)) (holding that unsworn statements may not be considered on a motion for summary judgment). We need not resolve this dispute, however, as Claimant's expert witness, Robert Kraft, testified at his deposition that the Defendant weapon could be converted to fire automatically in four to six hours to manufacturer's specifications and in two to three hours with hand-manufactured parts. Because we view the evidence in the light most favorable to the nonmoving party in reviewing a grant of summary judgment, *see Adickes*, 398 U.S. at 157, given the conflict between the FTB Report and the Claimant's expert-witness testimony, we are obliged to credit the Claimant's expert in any event, regardless of the admissibility of the FTB Report. As we must draw all reasonable inferences in favor of the party opposing the motion for summary judgment, *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005), we will assume that it would require six hours to restore the Defendant weapon to automatic shooting capacity.

### 3. "Can Be Readily Restored to Shoot[] Automatically"

We have not interpreted the phrase "readily restored" in a published opinion[7] or in the context of a weapon like the Defendant.[8] Webster's Third New International Dictionary defines "readily" to mean "with fairly quick efficiency," "without needless loss of time," "reasonably fast," "speedily," "with a fair degree of ease," "without much difficulty," "with facility," and "easily." Webster's Third New International Dictionary 1889 (1981). This definition identifies several components of "readily," most notably, speed, ease, and efficiency. The inclusion of limiting modifiers, i.e., "with *fairly* quick efficiency," "without *much* difficulty," and "*reasonably* fast," *id.* (emphasis added), makes clear that "readily" is a relative term, one that describes a process that is *fairly* or *reasonably* efficient, quick, and easy, but not necessarily the most efficient, speedy, or easy process.

In the context of the NFA and its use as a modifier describing the manner of firearm restoration, "readily" has been read to encompass several elements of restoration: (1) time, i.e., how long it takes to restore the weapon; (2) ease, i.e., how difficult it is to restore the weapon; (3) expertise, i.e., what knowledge and skills are required to restore the weapon; (4) necessary equipment, i.e., what tools are required to restore the weapon; (5) availability, i.e., where additional parts are required, how easily they can be obtained; (6) expense, i.e., how much it costs to restore the weapon; (7) scope, i.e., the extent to which the weapon has to be changed to allow it to shoot automatically; (8) feasability, i.e., whether the restoration would damage or destroy the weapon or cause it to malfunction. *See S.W. Daniel, Inc. v. United States*, 831 F.2d 253, 254-55 (11th Cir.

---

slitting disk, a drill press, and hand files.

[7] In an unpublished opinion, we held that a disassembled weapon that could be converted to fire automatically could be "readily restored" despite evidence that it was missing a necessary part because the part was available on the open market. *United States v. Cook*, No. 92-1467, 1993 WL 243823, at *3-4 (6th Cir. July 6, 1993).

[8] We recently concluded that a modified semiautomatic rifle could be "readily restored" under the NFA; however, this decision was reached on the basis of ATF conclusions without the court's analysis of the meaning of "readily restored" and how this requirement applied to the specific characteristics of the weapon it was considering. *See One Harrington & Richardson Rifle, Model M-14, 7.62 Caliber Serial No. 85279*, 378 F.3d at 534-35. There, however, we were able to consider the FTB Report's conclusions regarding the firearm because it was accompanied by an affidavit. *United States v. One Harrington & Richardson Rifle, Model M-14, 7.62 Caliber Serial Number 85279*, 278 F. Supp. 2d 888, 891-92 (W.D. Mich. 2003). Moreover, in that case, the claimant failed to put forth any expert evidence to contest the Report's findings, *id.* at 892, and thus we could properly rely on the moving party's unrebutted evidence in reviewing the grant of summary judgment. We have also held that a firearm that can be converted to shoot automatically within two minutes "can be readily restored." *United States v. Woodlan*, 527 F.2d 608, 609 (6th Cir.), *cert. denied*, 429 U.S. 823 (1976).

1987) (ease and scope); *United States v. Alverson*, 666 F.2d 341, 345 (9th Cir. 1982) (expertise,[9] ease, and scope); *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (time and equipment); *United States v. Aguilar-Espinosa*, 57 F. Supp. 2d 1359, 1362 (M.D. Fla. 1999) (time, ease, expertise, and equipment); *United States v. Seven Misc. Firearms*, 503 F. Supp. 565, 573-75 (D.D.C. 1980) (time, ease, expertise, equipment, availability, expense, and feasibility); *United States v. Cook*, No. 92-1467, 1993 WL 243823, at *3-4 (6th Cir. July 6, 1993) (availability).

The statutory canon of construction *noscitur a sociis*, or "it is known by its associates," instructs "that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." Black's Law Dictionary 1087 (8th ed. 2004); *see also Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997). "[R]eadily restored," therefore, must not be construed as an abstract phrase, but rather its contours should be determined in the context of what it means to be able to "readily restore[]" a machinegun as opposed to some other object. The sort of object being restored, primarily its complexity, helps to determine whether a given amount of time, money, expertise, and skill required to restore it is considered a "ready" restoration. For example, a car that could be restored in ten hours for $500 would likely be considered "readily restored," whereas a skateboard that required the same inputs likely would not be considered "readily restored." Although the dissent asserts, based on "common sense," that "a process [of restoration] that takes in excess of four to six hours" could not be "ready," Dissenting Opinion ("Dissent. Op.") at 11, this contention lacks meaning because it is too abstract and fails to consider what "readily restored" means in the context of a highly complex firearm.

The decisions of several other courts make clear that the Defendant weapon, which would require, according to Alverson's own expert, a maximum of six hours to convert to fire automatically, "can be readily restored" under the NFA. The Eighth Circuit held that a semiautomatic rifle that would take an eight-hour working day in a properly equipped machine shop to convert to shoot automatically qualified as a "machinegun" under the NFA.[10] *Smith*, 477 F.2d at 400; *cf. United States v. Shilling*, 826 F.2d 1365, 1367 (4th Cir. 1987) (holding that disassembled guns that could be made to shoot automatically were "readily restor[able]"); *S.W. Daniel, Inc.*, 831 F.2d at 254-55 (upholding the use of a jury instruction defining a machinegun as "those weapons which have not previously functioned as machine guns but possess design features which facilitate

---

[9] In *Alverson*, the Ninth Circuit considered the defendant's personal knowledge and experience in converting semiautomatic weapons to fully automatic in determining that the weapon in question could be "readily restored." 666 F.2d at 345. Were we to consider expertise this way — i.e., taking into account the knowledge and skills of the particular defendant/claimant — this would only further bolster our conclusion that the Defendant weapon "can be readily restored," as Claimant Alverson in the case at bar is an expert gunsmith. (The Ninth Circuit case involved a different claimant).

[10] One district court opinion, on which the dissent relies heavily, Dissent. Op. at 12, criticized *Smith* for "press[ing] the notion of 'ready restoration' near or beyond its distal boundary." *Aguilar-Espinosa*, 57 F. Supp. 2d at 1362 (defining "ready restoration" as "a less than arduous assembly of manageable and available parts by a combination of (1) the ability of a reasonably skilled and informed but not necessarily expert or artistic worker and (2) tools commonly understood by and commonly available to such workers, including, for example, Allen wrenches, files, jeweler's screw drivers, and the like but excluding, for example, the resources available to a master machinist with a modern and well-equipped lathe"). However, that court's understanding of "readily restored" is based on its impressionistic concept of this term formulated almost entirely from whole cloth and is only marginally supported by the authorities it cites. *See id.* Moreover, the court there did not have occasion to apply its stated definition nor did it decide whether the weapon in question could be "readily restored to shoot[] automatically," and thus this definition is dicta, and it remains uncertain how it would have been applied. Therefore, the dissent's reliance on *Aguilar-Espinosa* is curious, and is made even more curious because it is a district court opinion that is not binding precedent on any court. In any event, based on the record evidence, the Defendant weapon potentially satisfies even *Aguilar-Espinosa*'s definition of "readily restored."

Although the dissent claims that we "rel[y] on *Aguilar-Espinosa* to support [our] definition of 'readily restored,'" Dissent. Op. at 12 n.6, we cite the case as one of many to illustrate the variety of factors that courts have considered in giving meaning to "readily restored."

full automatic fire by simple modification or elimination of existing component parts"); *Alverson*, 666 F.2d at 345 (concluding that an automatic weapon that was converted to fire semiautomatically prior to its sale to defendant could be "readily restored" where it could be modified to shoot automatically by filing down one of its parts); *United States v. Lauchli*, 371 F.2d 303, 312-13 (7th Cir. 1966) (in a case prior to the addition of the "can be readily restored" language to the NFA, deciding that weapons requiring assembly to shoot automatically were machineguns under the NFA).

The Defendant weapon in the case at bar can be converted to fire automatically in even less time than the weapon that could be "readily restored" in *Smith*. Alverson's expert testified that the Defendant rifle could be restored to fully-automatic-shooting capacity to manufacturer's specifications in four to six hours with particular machinery or in two to three hours by hand manufacturing the parts.[11]

The two relevant cases finding that the weapons there considered were not readily restorable can be distinguished from the Defendant weapon. In *Seven Miscellaneous Firearms*, the district court found that weapons forfeited from a museum collection were not readily restorable where conversion would require expert gunsmith services, tools costing up to $65,000, essential parts that could not be found in this country, and between four and perhaps in excess of thirty hours, and could damage or destroy the weapons and cause them to injure the shooter upon firing. 503 F. Supp. at 573-75. By contrast, the Defendant weapon here had all of the necessary parts for restoration and would take no more than six hours to restore. In *F.J. Vollmer Company v. Higgins*, the District of Columbia Circuit rejected the ATF's once-a-machinegun-always-a-machinegun rule and held that where a manufacturer had altered an automatic weapon by removing certain features that caused the weapon to be classified as a machinegun, the ability to convert the weapon back to automatic firing capacity did not make the weapon capable of being "readily restored." 23 F.3d 448, 451-52 (D.C. Cir. 1994). However, that court's decision was based on the unreasonableness of prohibiting the company from adding a legal part to a semiautomatic receiver simply because the receiver had once been automatic and because there were no findings to support the contention that the reconfigured semiautomatic receiver was "potentially restorable" to a machinegun receiver. *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 594 (D.C. Cir. 1996).[12]

Alverson additionally argues that the Defendant weapon cannot be "readily restored" because "restore" means to bring back to an original condition, and the Defendant weapon was not brought back to an original condition as it was made from cut-up M-14s. This argument lacks force because the definition of "restore" does not preclude an object from being considered "restored" without returning it to a condition in which it previously existed. Webster's Third New International Dictionary provides several definitions of "restore," one of which — "to bring back to or put back into a former or original state" — matches the definition Alverson cites, and others — "to put or bring back (as into existence or use)" and "to bring back from . . . a changed condition" — that are broader and make clear that to be "restored" does not require return to a preexisting state. Webster's

---

[11] Because this expert testified that the weapon could potentially malfunction if restored with hand-manufactured parts, and given that we must view the evidence in the light most favorable to the nonmoving party, we will assume that the restoration would require six hours.

[12] The dissent, in citing several precedents finding the weapons they consider capable of being "readily restored to shoot[] automatically," erroneously treats these holdings as representing the outer limits of what constitutes "readily restorable." Dissent. Op. at 12 (citing *Woodlan,* 527 F.2d at 608; *F.J. Vollmer Co., Inc.*, 23 F.3d at 452; *Alverson*, 666 F.2d at 345; *United States v. Woods*, 560 F.2d 660, 664-65 (5th Cir. 1978); *United States v. Catanzaro*, 368 F. Supp. 450, 453 n.3 (D. Conn. 1973)). However, these courts certainly did not "adopt . . . tests for defining what constitutes 'readily restorable,'" Dissent. Op. at 12, nor even define the boundaries of "readily restorable," but merely found that the weapons they considered fell within a spectrum of weapons that are "readily restorable." Therefore, these precedents do not support the dissent's conclusion that the Defendant weapon cannot be "readily restored."

Third New International Dictionary 1936. Several courts have so interpreted "readily restored" to encompass weapons that were "originally legal semi-automatic rifles" and only later converted to shoot automatically. *Shilling*, 826 F.2d at 1367; *accord Alverson*, 666 F.2d at 345; *see also S.W. Daniel, Inc.*, 831 F.2d at 254 (approving jury instruction explaining "readily restored" to include "weapons which *have not previously functioned as machine guns* but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts" (emphasis added)).[13]

In any event, the M-14 parts from which the Defendant weapon was manufactured had once been part of an M-14 weapon that fired automatically. Therefore, modifying the Defendant weapon to fire automatically would constitute "restoration" even under the narrower definition Alverson offers.

Finally, we reiterate that the Government must only show probable cause to justify the forfeiture, and the Claimant then bears the burden of proving his case by a preponderance of the evidence. *See Any & All Radio Station Transmission Equip.*, 218 F.3d at 548. Therefore, despite the minimal record available to us on review, the testimony by Alverson's own witness that the Defendant weapon could be converted into an automatic weapon in a matter of hours, which the United States submitted in support of its motion, suffices to meet the Government's burden. Alverson's proffered evidence, which consists solely of this same expert testimony and a letter from MKS describing some of the features of the MKS-modified M-14 receiver, fails to create a genuine issue of material fact, even without consideration of the FTB Report or the ATF Rulings. Based on the evidence presented and the legal definition of "readily restored," no reasonable juror could conclude that the Defendant weapon was not a machinegun under 26 U.S.C. § 5845(b).

### 4. Designed to Shoot Automatically

As our conclusion that the Defendant firearm "can be readily restored to shoot[] automatically" is sufficient to classify it as a machinegun and to justify the forfeiture in this case, we decline to consider whether the firearm is also "designed to shoot" automatically.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment granting the Government's motion for summary judgment.

---

[13]Despite the dissent's contention that "restore" means only to return to a preexisting condition, it nonetheless cites *S.W. Daniel*'s approval of this jury instruction to support its conception of "readily." Dissent. Op. at 12 n.6 (citing *S.W. Daniel*, 831 F.2d at 254).

———————————

**DISSENT**

———————————

GRIFFIN, Circuit Judge, dissenting. I respectfully dissent. I would hold that the MKS-M14A is not a "machinegun," as defined by 26 U.S.C. § 5845(b), because it cannot "be readily restored to shoot, automatically." Accordingly, I would reverse and remand for further proceedings.

I.

We review de novo the district court's grant of summary judgment. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000).[1] Summary judgment is warranted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Of course, it is well-established that a motion for summary judgment must be supported by affidavits, depositions, answers to interrogatories, admissions on file, or other documentary evidence. FED. R. CIV. P. 56(c). In reviewing those materials, "[t]he Court should believe the evidence presented by the nonmovant, and draw all justifiable inferences in his favor." *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002) (citing *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 933-34 (6th Cir. 2000)).[2]

Pursuant to Rule 56(e), an unauthenticated document like the Vasquez report may not be considered.[3] *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993). Without the Vasquez report, we are left to rely on the deposition testimony of claimant's expert, who testified, in pertinent part, as follows:

Q　　In making that change [to convert the MKS-M14A to shoot automatically] do you have an estimate of how long it would take you to make that change if you could make that change?

———————————

[1] I note preliminarily that Congress recently enacted the Civil Asset Forfeiture Act of 2000 (CAFRA). In doing so, Congress intended to "rectify an unfairness to the individual vis-a-vis the government . . . by leveling the playing field between the government and persons whose property has been seized." *United States v. Real Property in Section 9, Otsego County*, 241 F.3d 796, 799 (6th Cir. 2001). Among other changes, the law corrected a widely criticized "aberration" in the prior forfeiture law that placed the burden of production and persuasion on the *claimant* to prove that the property was *not* subject to forfeiture after the government established mere probable cause. *Id*. In its place, CAFRA implemented the customary burden of production and persuasion in civil actions, which requires the government to prove its case by a preponderance of the evidence. 18 U.S.C. § 983(c)(1). Although CAFRA's language indicating its applicability to any civil forfeiture action brought under any "civil forfeiture statute," 18 U.S.C. § 983(c)(1), suggests its corresponding applicability to this case, CAFRA specifically exempts "the Internal Revenue Code of 1986" from its definition of a "civil forfeiture statute," *id*. § 983(i)(2)(B). Accordingly, because the National Firearms Act is part of Title 26 (the Internal Revenue Code), § 983(i)(2)(B) prevents CAFRA from applying to this case.

[2] Significantly, the majority ignores this aspect of our summary judgment standard of review.

[3] Notably, the Ninth Circuit is also working to resolve the instant issue. The case of *United States v. One TRW U.S. Rifle, Model 14, 7.62 x 51 mm caliber*, involves the same rifle manufactured by the same company, a similar fact pattern, and the same counsel for appellant. The district court of Arizona issued an order granting summary judgment to the United States declaring that the defendant weapon was forfeitable as a "machinegun." *United States v. One TRW U.S. Rifle, Model 14, 7.62 x 51 mm caliber*, No. CIV 02-264-TUC-RCC (D. Ariz. Apr. 16, 2004). In that case, Officer Vasquez also helped the United States conclude that the defendant weapon is a "machinegun" within the meaning of § 5845(b). Brief of Appellee (No. 04-16049), 2004 WL 3155791, **5-6 (9th Cir. Dec. 16, 2004). The Ninth Circuit recently heard oral argument in this case on February 15, 2006.

A        I've thought about, you know, the equipment and stuff I would have, if I had the machines available to make the parts to what I would call OM, original manufacturer's specs.  You're probably looking at a ballpark of about four to six hours.

This unrebutted evidence establishes that the MKS-M14A *could* be converted by an *expert gunsmith with readily available equipment* to shoot automatically in four to six hours.  The issue therefore becomes whether the MKS-M14A, which could be converted by an expert gunsmith with readily available equipment to shoot automatically in four to six hours, is a weapon that, as a matter of law, can "be readily restored to shoot, automatically."  26 U.S.C. § 5845(b).[4]  In light of that testimony, alongside the reasons that follow, I conclude that the rifle cannot be "readily restored" to shoot automatically.[5]

## II.

The inquiry begins with the fundamental purpose of judicial construction of statutes, which is to ascertain and give effect to the original meaning of the words used by Congress:

> [W]e begin with the understanding that Congress "says in a statute what it means and means in a statute what it says there," *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992).  As we have previously noted in construing another provision of § 506, when "the statute's language is plain, 'the sole function of the courts'" - at least where the disposition required by the text is not absurd - "'is to enforce it according to its terms.'"  *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S. Ct. 192, 61 L. Ed. 442 (1917)).

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).

---

[4] Title 26 U.S.C. § 5845(b) provides:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

Pursuant to the National Firearms Act, it is illegal for an individual to possess a "machinegun" that is not registered to him in the National Firearms Registration and Transfer Record. *Id*., § 5861(d).

[5] Moreover, when purchasing the MKS-M14A, the manufacturer, MKS Specialties, represented to claimant that the weapon could not be restored to shoot automatically:

> To render the function of this receiver [of the rifle] safe during firing, a piece cut from an auto sear is welded directly to the rear of the receiver to allow for the use of the connecting rod. *By welding this piece to the receiver it makes any modification or conversion to a select fire or full auto weapon impossible without damaging or rendering the receiver useless*. The button which is attached to this section is strictly cosmetic and in no way is it, or can it be converted for full auto use.

(Emphasis added.)  Because the government did not object to claimant's submission of the MKS letter, this evidence is unrebutted and, as a result, the government has failed to demonstrate that the MKS-M14A was designed to shoot automatically. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived . . . .").

Where, as here, no statutory definitions exist, courts may refer to dictionary definitions for guidance in discerning the plain meaning of a statute's language. *United States v. Edward Rose & Sons*, 384 F.3d 258, 263 (6th Cir. 2004); *Cler v. Ill. Educ. Ass'n*, 423 F.3d 726 (7th Cir. 2005); *Cleveland v. City of L.A.*, 420 F.3d 981, 989 (9th Cir. 2005). The ordinary, common meaning of the word "readily" is "[i]n a prompt, timely manner; promptly." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 222 (4th ed. 2000). Other dictionaries are to the same effect:

> "in a ready manner: as a : without hesitating : WILLINGLY <readily accepted advice> b : without much difficulty : EASILY <for reasons that anyone could readily understand>[,]" MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.m-w.com (enter term "readily");

> "quickly, immediately, willingly or without any problem," CAMBRIDGE ADVANCED LEARNER'S DICTIONARY, http://dictionary.cambridge.org/ (enter term "readily");

> "[i]n a prompt, timely manner; promptly," DICTIONARY.COM, http://dictionary.reference.com/ (enter term "readily").

Correspondingly, "restorable" means "[a]dmitting of being restored; capable of being reclaimed; as, restorable land." DICTIONARY.COM, http://dictionary.reference.com/ (enter term "restorable").

Although the majority recites a variety of similar definitions for the term "readily," it thereafter relies on the "modifiers" contained in those definitions to conclude that the term "encompass[es] several elements of restoration[.]" This approach clouds the issue and opens the door to future extensions of the word "readily" in contravention of the objective understanding of the word. In my view, it defies common sense to conclude that a process that takes in excess of four to six hours is "a process that is *fairly* or *reasonably* efficient, quick, and easy . . . ." *Id.*

Moreover, the majority's analysis of whether the MKS-M14A could be restored to shoot automatically fails to adequately explain how the defendant weapon, which is a new and entirely separate weapon from the M14, could be "restored" in any fashion. "Restoration" acts to "return[] something to its earlier good condition or position." CAMBRIDGE ADVANCED LEARNER'S DICTIONARY, http://dictionary.cambridge.org/ (enter term "restoration"). Although no "earlier" version of the MKS-M14A exists, the majority relies on "broader" definitions for the term "restored" in an effort to explain that an item need not "return to a preexisting state[]" to render it "restored." Like its efforts to define "readily," the majority's approach to the term "restore" further clouds the issue and again assigns to the term a definition without boundaries. For example, pursuant to the majority's limitless definition of "restore," even a single shot weapon is now conceivably subject to forfeiture. Indeed, the skilled technician who is somehow capable of converting a single shot weapon to fire automatically has "restored" the weapon to shoot automatically because, according to the majority, restoration "does not require return to a preexisting state." *Id.*

Considering the dictionary definitions for the words "readily" and "restored," I reject the conclusion reached in *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973), that a firearm is readily restorable to shoot automatically when it takes eight hours to rebuild and reconstruct the rifle by an expert gunsmith in a machine shop. Similarly, I reject the majority's reliance on *Smith* to reach its conclusion that a somewhat lesser time frame satisfies the "readily restorable" language in § 5845(b).

III.

The conclusion reached in *United States v. Smith* that a rifle can be readily restored is contrary to the weight of recent authority. For example, the district court in *United States v. Aguilar-Espinosa*, 57 F.Supp. 2d 1359 (M.D. Fla. 1999), defined "readily restorable" as a "less than arduous assembly of manageable and available parts by a combination of (1) the ability of a reasonably skilled and informed but not necessarily expert or artistic worker and (2) tools commonly understood by and commonly available to such workers . . . but excluding, for example, the resources available to a master machinist . . ." *id.* at 1362. *Accord United States v. Seven Misc. Firearms*, 503 F. Supp. 565, 573-74 (D.D.C. 1980) (finding weapon was not "readily restorable" because to accomplish such a procedure would require more than four hours in a shop with appropriate tools, expert gunsmith services, and the sum of roughly $65,000).

Other courts have likewise adopted similar tests for defining what constitutes "readily restorable." *See*, *e.g.*, *United States v. Woodlan*, 527 F.2d 608, 609 (6th Cir. 1976) (finding weapon "readily restorable" because it was "capable of being modified in two minutes to fire automatically"); *United States v. Woods*, 560 F.2d 660, 664-65 (5th Cir. 1977) (finding weapon was "readily restorable" because merely connecting two pieces with a "minimum of effort" rendered it operable); *United States v. Catanzaro*, 368 F. Supp. 450, 453 n.3 (D. Conn. 1973) (finding weapon "readily restorable" because it required only $15 worth of easily obtainable replacement parts and one hour of assembly); *United States v. Alverson*, 666 F.2d 341, 345 (9th Cir. 1982) (finding sufficient evidence that defendant possessed a "readily restorable" machinegun because it would convert to fully automatic if the "disconnect" were filed down or shaved off); *F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 452 (D.C. Cir. 1994) (analyzing whether "critical features" of the weapon would be required to render the weapon "readily restorable").

Applying the dictionary definitions of "readily restorable" in conjunction with the foregoing caselaw survey highlights the anomalous nature of the Eighth Circuit's decision in *United States v. Smith*, 477 F.2d at 400. *Accord Aguilar-Espinosa*, 57 F. Supp. 2d at 1362 (noting *Smith* "presses the notion of 'ready restoration' near or beyond its distal boundary").[6] The majority's reliance on that decision is therefore misplaced.

---

[6]The majority seeks to distinguish the *Aguilar-Espinosa* court's criticism of the *Smith* decision by noting the *Aguilar-Espinosa* court's "understanding of 'readily restored' is based on its impressionistic concept of this term formulated almost entirely from whole cloth" and, as a result, the majority designates the *Aguilar-Espinosa* court's definition as dicta. Although the majority criticizes the *Aguilar-Espinosa* decision, it nevertheless relies on *Aguilar-Espinosa* to support its definition of "readily restored."

On the merits, the authorities cited by the *Aguilar-Espinosa* court support that court's definition of "readily restorable." Indeed, the court in *S.W. Daniel, Inc. v. United States*, 831 F.2d 253 (11th Cir. 1987), affirmed the district court's use of a jury instruction, which cited § 5845(b) almost verbatim, and then emphasized that only a "simple modification" was required to qualify the weapon as a machinegun, *id.* at 254. Similarly, in *United States v. Woods*, 560 F.2d 660 (5th Cir. 1977), the court concluded that a weapon was "readily restorable" because merely connecting two pieces with a "minimum of effort" rendered it operable, *id.* at 664-65. Finally, we recognized in *United States v. Woodlan*, 527 F.2d 608 (6th Cir. 1976), that a weapon was "readily restorable" because it was "capable of being modified in two minutes to fire automatically[,]" *id.* at 609. The three cases relied upon by the *Aguilar-Espinosa* decision therefore squarely support the court's definition of "readily restorable."

The majority asserts, in conclusory fashion, that "the Defendant weapon potentially satisfies even this definition [provided by the *Aguilar-Espinosa* court] of 'readily restored.'" Because the majority declines to accompany that statement with any governing legal authority, it is difficult to discern how a six-hour timetable for reconstructing the defendant rifle would satisfy the *Aguilar-Espinosa* court's definition of "readily restorable" which focuses on simplicity and expediency.

## IV.

Finally, I note that the available legislative history supports my position. Although I am mindful of the limited utility and reliability of legislative history, *see Exxon Mobil Corp. v. Allapattah Servs., Inc.*, -- U.S. --, 125 S. Ct. 2611, 2626 (2005), it nonetheless reveals that "'readily restored to shoot' is intended to mean that *only a simple mechanical operation* is required to restore a weapon to a capacity of fully automatic fire." Omnibus Crime Control and Safe Streets Act of 1967, H.R. 1097, 90th Cong. § 911(b)(1968) (emphasis added). Consistent with the dictionary definition of "readily," this brief legislative history reflects the need for courts to focus on the expediency of the process involved to restore the weapon.

## V.

For these reasons, I respectfully dissent. Viewing the evidence in the light most favorable to Alverson and drawing all reasonable inferences in his favor, *see United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), I would reverse and remand for further proceedings.