**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0528n.06

**No. 12-2205**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | *May 29, 2013* |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| GEORGE ARTHUR DODSON, III, | ) | District of Michigan |
| | ) | |
| Defendant-Appellant. | ) | OPINION |

Before:      BOGGS and COLE, Circuit Judges; and QUIST, District Judge[*]

BOGGS, Circuit Judge.  Gun enthusiast George Dodson was in the business of selling AR-15

drop-in auto sears, which, in combination with M16 parts, can be used to convert AR-15s to fully

automatic firearms.  Since 1981, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

has considered these auto sears "machineguns" subject to the full scope of regulation under the

National Firearms Act.  Apparently under the belief that his pre-1981 auto sears were exempt,

Dodson continued selling them for over thirty years, until he was caught and charged with possession

of a machinegun.  Dodson pleaded guilty, but now challenges various guidelines enhancements and

the reasonableness of his sentence.  In particular, he argues the district court erred in finding no

exemption for pre-1981 auto sears and, if not, that it erred in failing to consider his mistake-of-law

---

[*]The Honorable Gordon J. Quist, United States District Judge for the Western District of
Michigan, sitting by designation.

and good-faith-reliance defenses. Although Dodson's misconception was not uncommon, it is not

supported by the law. In addition, because mistake of law is no defense and Dodson did not establish

good-faith reliance, the district court was not required to consider these at sentencing. In any case,

the district court implicitly rejected these defenses, finding Dodson likely to violate the gun laws

again. Dodson also argues that certain machineguns he owned were not "readily restorable," and

thus should not have been considered at sentencing. As the district court's restorability

determination rested on credible evidence and the proper legal standard, there was no error. The

sentence is affirmed.

# I

In 1979, Dodson developed and began selling an AR-15 "safety sear," a readily installable

device that when added to an AR-15 replicates the built-in trigger mechanism of a fully automatic

weapon. In 1981, the ATF issued Ruling 81-4, which classified these AR-15 drop-in auto sears as

"machineguns" under the National Firearms Act, because they are "a combination of parts designed

and intended for use in converting a weapon to shoot automatically more than one shot." ATF Rul.

81-4, 1981-3 A.T.F.Q.B. 78; 26 U.S.C. § 5845(b). Dodson, and many others, read the ruling as

grandfathering in auto sears manufactured before November 1, 1981, exempting them from the tax

and registration requirements of the National Firearms Act.[1]  As a result, he manufactured and

---

[1]The precise contours of this supposed exception are not well defined. *See* Stephen Halbrook, *Firearms Law Deskbook* § 9:5 (discussing ATF Ruling 81-4 and AR-15 rifle prosecutions). The ATF has made clear that possession of even a pre-1981 auto sear, when in combination with certain other parts or an AR-15, is considered possession of a machinegun. Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Handbook*, App'x B, editor's note to Ruling 81-4. In the firearms community, therefore, a common belief is that while pre-1981 auto

stockpiled thousands of auto sears before the deadline, selling the inventory through his company, Su-Press-On, Inc., for the next thirty years. The ATF began an investigation after discovering one of Dodson's auto sears in the weapons cache of a Michigan-based organization known as the "Hutaree," alleged to be an "anti-government extremist organization which advocates violence against local, state, and Federal law enforcement." *See United States v. Stone*, No. 2:10-cr-20123-VAR-PJK (E.D. Mich. Mar. 29, 2010). In 2001, an ATF agent responded to an advertisement in "The Shotgun News" and purchased an auto sear from Dodson for $105, through mail order. The ATF subsequently executed search warrants on Dodson's residence and storage units, finding 40 auto sears, eight other machineguns, and hundreds of legal firearms.

On October 11, 2011, a grand jury returned a 151-count superseding indictment, charging Dodson with various firearms-related crimes, including unlawful possession of machineguns, possession of unregistered machineguns, and dealing in firearms without a license. Dodson moved to dismiss the auto-sear counts, arguing that pre-1981 auto sears were legal to possess and transfer, without registration. The district court denied the motion, holding that the date of manufacture of the auto sears was irrelevant. On the eve of trial, Dodson pleaded guilty to unlawful transfer of a machinegun, in violation of 18 U.S.C. § 922(o). He reserved the right to appeal three disputed sentencing enhancements: a six-level enhancement for possession of 25–99 firearms; a four-level

---

sears are legal, they are no better than expensive paperweights given that they may be only possessed alone. *See, e.g.*, James Jeffries, *AR-15 Drop-In Autosears*, http://www.ar15.com/content/legal/dias.html (accessed May 2013); *AR15 Drop-In Auto Sears - What's the Difference?*, http://www.quarterbore.com/nfa/dias.html (last updated Mar. 23, 2004); *Legal Side*, Small Arms Review, May 1998, at 14, *available at* http://www.titleii.com/bardwell/ar_15_auto_sear_faq.txt.

enhancement for possession of firearms with obliterated serial numbers; and a four-level enhancement for trafficking in machineguns.

Dodson's objection to the number-of-firearms and trafficking enhancements was the same as in his original motion to dismiss: pre-1981 auto sears are legal to possess and sell. The district court again rejected this argument. Dodson also objected to the enhancement for possession of firearms with altered or obliterated serial numbers. Although the auto sears never had serial numbers in the first place, three of the other machineguns found by the ATF had their serial numbers removed. These were World War II-era submachine guns (colloquially known as "grease guns"), which had been sawed in half and distributed as demilitarized scrap by the U.S. Government.[2] The ATF welded the two halves of one of the grease guns together, and with the addition of spare

---

[2]Before the passage of the Gun Control Act and National Firearms Act in 1968, the U.S. Government facilitated the distribution of surplus and obsolete military weapons through its deactivated war trophy (DEWAT) and demilitarization programs. *See generally* National Commission on the Causes and Prevention of Violence, Firearms & Violence in American Life 167–68 (1969). The DEWAT program, aimed at returning servicemen, permitted owners of prohibited weapons to keep them, if rendered inoperable by welding the barrel shut under the supervision of the ATF. *See* Rev. Rul. 55-590, 1955-2 C.B. 483 (1955); Rev. Proc. 58-8, 1958-1 C.B. 690 (1958). After the DEWAT program was discontinued, the military continued to sell obsolete weapons, demilitarized by torch cuts across the receivers, to junk dealers. Firearms & Violence in American Life at 168. Under the 1968 amendments to the federal gun laws, however, registration was required for "all firearms [as defined by the statute, i.e., short-barreled shotguns and rifles, machineguns, silencers, and destructive devices], whether or not antiques, unserviceable, Dewats, or in the possession of peace officers." *United States v. Whalen*, 337 F. Supp. 1012, 1016–17 (S.D.N.Y. 1972); *see also United States v. Ross*, 9 F.3d 1182, 1184–85 (7th Cir. 1993), *reversed on other grounds by* 40 F.3d 144 (7th Cir. 1994). From 1968 on, only truly unrestorable firearms within the statutory categories have been exempt from regulation. *See, e.g., United States v. Wada*, 323 F. Supp. 2d 1079 (D. Or. 2004); *United States v. Seven Miscellaneous Firearms*, 503 F. Supp. 565 (D.D.C. 1980).

machinegun parts and 90 minutes of labor, successfully managed to restore the grease gun to full capability. Finding the guns could be "readily restored," the district court applied the enhancement.

With these enhancements applied, the court determined the Guidelines range to be 97–121 months. The government recommended a downward variance to 60 months. Taking into account Dodson's poor health and advanced age (70 at the time of sentencing), the district court varied even further downward, imposing a sentence of 36 months. Dodson now appeals his sentence, objecting to the sentencing enhancements imposed and the reasonableness of his sentence. Dodson also makes similar objections to pre-trial rulings of the district court, but since Dodson "waive[d] any right to appeal his conviction," we will not reach these objections.

## II

## A

We review the district court's legal conclusions regarding the Sentencing Guidelines *de novo* and its findings of fact for clear error. *United States v. Catchings*, 708 F.3d 710, 720 (6th Cir. 2013). Under the Sentencing Guidelines, if a firearm offense involves 25–99 (unlawful) firearms, the offense level is increased by 6 levels. USSG § 2K2.1(b)(1)(C) & cmt. n.5. Dodson challenges the classification of his auto sears as unlawfully possessed machineguns; this is a legal question of statutory interpretation subject to *de novo* review. *See United States v. Woodard*, 337 F. App'x 534, 537 (6th Cir. 2009).

The relevant statute here is the National Firearms Act, which defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot . . . [including] any part designed and intended solely and exclusively, or combination

of parts designed and intended, for use in converting a weapon into a machinegun . . . ." 26 U.S.C. § 5845(b). Initially, the statute only considered a "combination" of parts to constitute a machinegun; the 1986 Firearm Owners' Protection Act, expanded the definition to include "any" individual part. Pub. L. No. 99-308, § 109, 100 Stat. 449, 460 (1986). The National Firearms Act subjects machineguns and other specified firearms to various tax, registration, and other regulatory requirements, criminalizing violation of its provisions. 26 U.S.C. § 5861. The federal machinegun ban—the provision under which Dodson was convicted—incorporates the same definition of machinegun. 18 U.S.C. § 922(o); 18 U.S.C. § 921(a)(23).

Historically, it was not clear whether AR-15 drop-in auto sears were "machineguns" as defined by 26 U.S.C. § 5845(b). ATF Ruling 81-4, however, clarified that these auto sears were considered "machineguns," subject to all the provisions of the National Firearms Act.[3] ATF Rul. 81-4, 1981-3 A.T.F.Q.B. 78. Despite passing references to his auto sears as "safety sears," Dodson does not on appeal contest the propriety of the ATF's determination. Instead, he claims the ATF ruling was meant to apply only on a prospective basis, as shown by its statement that "[w]ith respect to the machine gun classification of the auto sear under the National Firearms Act, pursuant to 26 U.S.C. 7805(b), this ruling will not be applied to auto sears manufactured before November 1, 1981." No court has definitively ruled on the retroactivity of 81-4, but the Seventh Circuit has taken a dim view of Dodson's position. *United States v. Cash*, 149 F.3d 706, 708 (7th Cir. 1998) ("Perhaps their reading has some basis that we do not now perceive. Firearms dealers would do well

---

[3]The ATF's power to interpret federal firearm laws is discussed in note 4 *infra*.

to assume, however, that all current transfers of auto sears must comply with the statutes, no matter when the devices were manufactured.").

To interpret this ruling properly, we must look to the statute under which the retroactivity is authorized. As a general matter, no "regulation relating to the internal revenue laws shall apply to any taxable period ending before [the filing of the regulation]." 26 U.S.C. § 7805(b)(1). Unlike regulations, rulings—being interpretations of existing law—will ordinarily be applied retroactively. Rev. Proc. 89-14, 1989-1 C.B. 814, sec. 7.01(3). The agency, however, may indicate the extent to which the ruling is to be retroactively applied, under the authority of § 7805(b)(8). *Ibid*. The ATF invoked such authority here, opting to apply Ruling 81-4 prospectively only. Although § 7805 is restricted to matters "relating to the internal revenue laws," the entire National Firearms Act, including its registration requirements, is codified within Title 26. *Cf. United States v. Matthews*, 438 F.2d 715, 716–17 (5th Cir. 1971) (holding registration requirement as an exercise of the national taxing power). It is plausible, therefore, that § 7805 may limit the retroactive application of all provisions of the National Firearms Act, both taxing and regulatory. As a result, the ATF does have the authority to retroactively excuse a class of weapons for failure to comply with registration requirements.

It is at this point, however, that Dodson's argument breaks down. While the ATF may retroactively exempt certain weapons from tax and regulation requirements, it cannot exempt those same weapons from prospective application of the law. This is clear from the particular wording of § 7805(b), which provides that no regulation shall apply "to any taxable period" ending before the filing date of the regulation. While § 7805 is meant to limit retroactive application of the law to pre-

filing *time periods*, it is not meant to exempt pre-filing *items* (whether manufactured or acquired before the regulation). Thus a certain item, to which the new ruling or regulation applies, is exempt in time 1 (pre-regulation) but taxed in time 2 (post-regulation). The same logic applies to registration requirements: the owner of the item is excused from having failed to register in time 1 but must comply with the law in time 2. The effect of the retroactivity of Ruling 81-4, therefore, is that pre-1981 manufacturers are exempt from the $200 making tax, 26 U.S.C. § 5821; pre-1981 sales are exempt from the $200 transfer tax, 26 U.S.C. § 5811; pre-1981 dealers are exempt from the $500 special occupational tax, 26 U.S.C. § 5801; and pre-1981 owners are exempt from criminal prosecution for past possession of an unregistered machinegun, 26 U.S.C. § 5861(d). But post-1981 transfers and possessions—even of previously manufactured auto sears—must be subject to the tax and registration requirements of the National Firearms Act. Dodson mistakes an exemption limited to past time periods for an absolute exemption for a class of items. All taxes and requirements prior to the date of the regulation are excused, but the activity underlying those taxes is subject to the law on a prospective basis.

Dodson's argument is further weakened by his attempt to stretch the ATF exemption beyond taxes and registration to a criminal statute, 18 U.S.C. § 922(o). Although there are plausible "taxpayer reliance" arguments for applying tax and economic laws prospectively, *cf. Dickman v. Comm'r of Internal Revenue*, 465 U.S. 330, 343 (1984), such policies are wholly inapplicable in the public-safety context. Automatic weapons are just as dangerous whether they were manufactured in 1981 or 2011, and Dodson's reading would legalize devices without even the added protective feature of federal registration. Dodson's argument is particularly problematic given the timing of

the machinegun ban, which came into effect five years after the 1981 retroactivity ruling. Pub. L.

No. 99-308, § 102. Dodson should not be able to bootstrap the 1981 ruling into an exemption from

the 1986 ban. This is especially so where the 1986 amendments expanded the definition of

machinegun, which by including "any" part—not just a combination of parts—more clearly brought

auto sears within the scope of the definition. The ATF does not have the ability to redefine or create

exceptions to Congressional statutes, and surely cannot do so before those statutes were passed.[4]

_____

[4]Dodson's arguments focus on the ATF's ability to create exceptions to the federal gun laws. This situation, however, also raises the question in reverse: can the ATF *expand* the scope of the federal gun laws? In particular, did Ruling 81-4 create criminal liability where there was none before? As a general matter, regulatory agencies may interpret general provisions in their statutes, even though criminal sanctions may result. *See Babbitt v. Sweet Home Chapter of Cmties. for a Great Oregon*, 515 U.S. 687 (1995) (upholding EPA regulation interpreting the statutory term "take" to include "harm"). Ruling 81-4 is such an interpretation of existing law, issued to facilitate compliance by the public, not create new law. Such rulings are typically considered informal rulemakings, not subject to the notice and hearing requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b)(A). *York v. Sec'y of Treasury*, 774 F.2d 417, 419–20 (10th Cir. 1985) (ATF ruling merely interpretative rule); *see also United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 420 (6th Cir. 2006) (declining to answer question of what deference is due to ATF rulings). While clearly of a more formal character than "user friendly" guides and handbooks, *e.g.*, *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 432 (4th Cir. 2010) (FAQs in ATF reference guide not agency action), interpretative rulings like Ruling 81-4 are distinguishable from "legislative" agency actions that "put[] new criminal liability on the acts or omissions of regulated persons," under authority delegated by statute, *see United States v. Cain*, 583 F.3d 408, 419, 420 (6th Cir. 2009) (Attorney General's regulation applying Sex Offender Registration and Notification Act to defendant subject to notice-and-comment procedures); *see also Gonzales v. Oregon*, 546 U.S. 243, 262, 269 (2006) (holding that Attorney General does not have statutory authority to criminalize assisted suicides and that his interpretation was inconsistent with the statute).

Statutes that require agency action to clarify their terms may raise fair notice and vagueness concerns. *See United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 518 & n.9 (1992) (applying rule of lenity where ATF rulings were not on point); *but see United States v. Evans*, 712 F. Supp. 1435, 1444 (D. Mont. 1989) (no due process violation where ATF failed to clarify statutory definition of machinegun). But once the ruling has issued, the defendant can no longer make such objections. *See United States v. Norris*, 39 F. App'x 361, 364 (7th Cir. 2002) (ATF definition of "place of residence" supported criminal conviction).

**B**

Faced with a losing interpretation, Dodson additionally argues that the district court erred in failing to consider his reasonable-mistake-of-law and good-faith-reliance defenses. To the extent that Dodson argues that his trial rights were violated by this error, he waived the right to make such a challenge in his plea agreement. Dodson also argues, however, that these defenses should have been considered as significant factors at sentencing. Although not clearly articulated, this would appear to be a challenge to the substantive reasonableness of the sentence, specifically, "failing to consider pertinent § 3553(a) factors." *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005). We review the substantive reasonableness of the district court's sentencing determination under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 46 (2007). A sentence within the Guidelines range is presumptively reasonable, and a sentence below the Guidelines range warrants even greater deference. *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008).

Dodson's mistake-of-law argument is not well taken. "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 199 (1991). In certain cases, Congress has "softened the impact of the common-law presumption by making specific intent to violate the law an element" of the crime. *Id*. at 200. As result, many complicated tax offenses require a "willful" mental state. *Ibid*. Here, however, the statute simply requires knowledge for violation of the crime. *Compare* 18 U.S.C. § 924(a)(2) ("Whoever knowingly violates subsection . . . (o) of section 922 shall be fined under this title, imprisoned not more than 10 years, or both.") *with* 18 U.S.C. § 924(a)(1)(D) ("[Whoever] willfully violates any other provision of this chapter shall be fined under this title,

imprisoned not more than five years, or both."). Further, a mistake-of-law defense is particularly inappropriate when applied to the federal machinegun ban, which has the characteristics of a public-welfare offense dealing with "dangerous or deleterious devices." *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 565 (1971). Such offenses require the individual to "ascertain at his peril whether that which he sells comes within the inhibition of the statute." *United States v. Balint*, 258 U.S. 250, 254 (1922) (narcotics); *see also United States v. Freed*, 401 U.S. 601, 609–10 (1971) (hand grenades); *United States v. Drasen*, 845 F.2d 731, 737–38 (7th Cir. 1988) (short-barrel rifle kits); *but see Staples v. United States*, 511 U.S. 600, 608–15 (1994) (government required to prove beyond a reasonable doubt that defendant knew semiautomatic weapon had automatic firing capability). The district court expressed its concern that Dodson was selling these "really dangerous weapons" to "anybody at all"—a concern that would not be mitigated by Dodson's subjective belief that his auto sears were exempt on a technicality. Where mistake of law is not relevant to the underlying offense, it cannot be an abuse of discretion for the district court to fail to consider such a defense at sentencing.

Although Dodson's good-faith-reliance argument—or as it is usually called, "entrapment by estoppel"[5]—is conceptually a viable defense, he fails to demonstrate any of its requirements. The "entrapment by estoppel" defense is available where 1) a government official announced that the charged criminal act was legal; 2) the defendant relied on that statement; 3) the defendant's reliance

---

[5]While this is the standard term, it refers to situations where the government is estopped from prosecuting someone because it acted in a way that entrapped the defendant. It does not mean the defendant "was entrapped due to some sort of estoppel." *United States v. Lemons*, 480 F. App'x 400, 402 n.1 (6th Cir. 2012).

was reasonable; and, 4) given the defendant's reliance, prosecution would be unfair. *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992). Here, Dodson relies on an investigative report of ATF agent Michael Powell, along with vague allegations that the ATF and federal prosecutors "misinterpreted" the ruling for years.[6] The Powell report closed an investigation for lack of prosecutorial potential, based on Powell's inability to determine the date of manufacture of certain auto sears. The report explained that "AR15 drop-in auto sears manufactured prior to November 1, 1981 are not subject to regulation under the National Firearms Act." This report is not sufficient to meet any of the necessary entrapment-by-estoppel elements. First, although the report suggests that auto sears may be exempt from the provisions of the National Firearms Act, it does not affirmatively state that possession of auto sears is legal under 18 U.S.C. § 922(o). Second, there is no evidence that Dodson was aware of this report, which was prepared in 2007 for an investigation in Texas. In addition, Dodson had been selling his auto sears for many years before this investigation—it does not appear that the report changed his behavior in any way. Third, even if he had read the report, it was not reasonable for Dodson to rely on the statements of an ATF field agent in an investigative context for conclusive determinations of law. Agent Powell was not a lawyer, nor was he intending to provide legal guidance to the general public. Fourth, it is not even clear that prosecution would have been unfair. Dodson was aware he was selling dangerous, heavily regulated items to unknown individuals, but continued to take advantage of a narrow technicality for over thirty years without obtaining any formal opinion from the ATF. Given the weakness of his entrapment-by-estoppel

---

[6]Dodson also suggests that he relied on ATF Ruling 81-4. As discussed before, his reading of the ruling was not reasonable, and thus should not have been relied on.

defense, the district court did not abuse its discretion in failing to consider such a defense at sentencing. *Cf. United States v. Walker*, 450 F. App'x 464, 468 (6th Cir. 2011) (rejecting equitable-estoppel challenge to sentencing determination due to lack of affirmative misconduct by the government); *see also Lemons*, 480 F. App'x at 400 (rejecting possibility of "partial" entrapment-by-estoppel defense).

Although in this case the district court was not required to address such arguments, the district court did implicitly consider whether the offense was committed in good faith. At the sentencing hearing, the district court stated that "I don't think you have learned from this and there's a high possibility that you will continue to engage in illegal conduct involving weapons." In explaining his decision to vary downward, the district judge cited Dodson's age and health, but admitted that "I do view him as still a threat to engage in illegal activities involving guns. . . . I do agree with [the Assistant U.S. Attorney], [Dodson] knew – does know everything – the defendant does know everything about guns." The district court did not abuse its discretion in finding Dodson's good-faith-reliance arguments unconvincing, especially where the ultimate sentence was significantly below the recommended guidelines range.

**III**

Dodson also objects to the sentencing enhancement for possession of a firearm with an obliterated serial number under USSG § 2K2.1(b)(4)(B).[7] In particular, he argues that the halved

---

[7]Dodson attempts to characterize the grease guns as de-militarized or scrap metal parts, and thus not firearms at all. Unfortunately, the National Firearms Act does not excuse old or de-militarized machineguns from regulation, as long as they are readily restorable. 26 U.S.C. § 5845(b).

grease gun should not be considered a machinegun, as it was not "readily restorable" under the terms

of 26 U.S.C. § 5845(b). The definition of the term "readily restorable" is a question of statutory

interpretation that we review *de novo*; any underlying factual findings we review for clear error. *See*

*United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 419, 425 (6th Cir. 2006).

Dodson's appellate argument relies on the opinion of his expert that the grease guns were

scrap. The condition in which the guns were obtained is not the relevant legal standard. Instead, the

question is whether the guns can be restored in "a process that is fairly or reasonably efficient, quick,

and easy, but not necessarily the most efficient, speedy, or easy." *Id.* at 422. Factors that courts have

considered include time, ease, expertise, availability, expense, scope, and feasability. *Ibid.* Courts

have found machineguns to be "readily restorable" although requiring up to a full day's work using

standard machine-shop tools to become operational. *Id.* at 423 (four to six hours); *United States v.*

*Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (eight hours). Here, the gun was restored with 90 minutes

of work, using widely available parts and equipment and common welding techniques. This process

---

Dodson's guns are not old enough to be considered "antique firearms" (Spanish-American War or earlier), 26 U.S.C. § 5845(g), and the exception for guns that "[are] primarily [] collector's item[s] and [] not likely to be used as [] weapon[s]" does not apply to machineguns, 26 U.S.C. § 5845(a); *see also United States v. Ross*, 9 F.3d 1182 (7th Cir. 1993), *reversed on other grounds by* 40 F.3d 144 (7th Cir. 1994) (conviction for unregistered deactivated World War I machinegun). The Act prohibits possession of any gun with obliterated serial numbers—even if it was manufactured before serial numbers were required, and even if the serial number was removed before such removal was illegal. 26 U.S.C. § 5861(h); 18 U.S.C. § 922(k); Crime Control Act of 1990, Pub L. No. 101-647, § 2202, 104 Stat. 4789, 4856 (criminalizing possession). This rule is strictly enforced, with no knowledge required for the sentencing enhancement to apply. USSG § 2K2.1 cmt. n.8(B).

fits comfortably within the relevant legal standard, and Dodson makes no challenges to the district court's finding that the ATF witness was credible. This enhancement was properly applied.

**IV**

Dodson finally objects to the district court's failure to apply various mitigating factors, in particular the loss of his entire financial savings and purpose in life. The inability to own firearms, however, was a consequence of his conviction, not his sentence, and thus would have been inappropriate for the district court to consider. *United States v. Bistline*, 665 F.3d 758, 766–67 (6th Cir. 2012). Dodson also suggests the district court did not fully consider his age, health, and mental illness. The district court, however, clearly addressed these factors and significantly departed downwards on their basis; it is difficult to see any reviewable basis for his objection. ("[Considering] the defendant's age, health, mental health issues, positive employment record, I do feel that the sentence is a sentence sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)."). The sentence was reasonable.

**V**

The sentence imposed by the district court is **AFFIRMED**.